UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ARTHUR J. GALLAGHER & CO.,

          Plaintiff,

    v.

ROBERT PETREE, et al.,

          Defendants.

No. 2:18-cv-03274-JAM-KJN

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Insurance broker Arthur J. Gallagher & Co. ("AJG" or "Plaintiff") initiated the present action following the resignation of its former employee, Robert Petree ("Petree"), who took a job at AJG's competitor, HUB International Insurance Services Inc. ("HUB"). Compl., ECF No. 1. AJG brings the following claims against Petree and HUB (collectively "Defendants"): (1) mistaken receipt against Petree only; (2) breach of implied-in-fact contract against Petree only; (3) misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act ("CUTSA"); (4) violation of the Defend Trade Secrets Act ("DTSA"); (5) breach of the purchase agreement against Petree only; (6) breach of the employment

1

agreement against Petree only; and (7) breach of the employment agreement (CA) against Petree only.  First Amended Complaint ("FAC"), ECF No. 17.

Defendants now move for summary judgment as to all claims. See Defs.' Mot. Summ. J. ("Mot."), ECF No. 100.  Plaintiff filed an opposition, see Opp'n, ECF No. 104, to which Defendants replied, see Reply, ECF No. 106.  For the reasons set forth below, the Court denies Defendants' motion for summary judgment.[1]

## I.   BACKGROUND

This case involves three contracts.  First, a Purchase Agreement dated May 15, 2008 (the "2008 Purchase Agreement") under which AJG purchased the assets, property, goodwill, and business of Petree's insurance brokerage business, Robert Petree Insurance Services ("RPIS").  Ex. A to Caldwell Decl., ECF No. 104-3.  In consideration for the conveyance of RPIS, AJG agreed to pay (1) a cash payment of $1,800,000 to Petree and RPIS; and (2) three earnout installment payments to Petree based on a formula set forth in the Purchase Agreement.  See generally 2008 Purchase Agreement.  Pursuant to this agreement, Petree received a total of $100,323 in earnout payments (the "Earnout Payments") between June 2009 and June 2011.  Mot. at 3; Opp'n at 2.  Second, an Employment Agreement dated May 15, 2008 (the "2008 Employment Agreement") under which AJG agreed to employ Petree in connection with the acquisition of RPIS.  Ex. B to Caldwell Decl.  Third, an

---

[1] This motion was determined to be suitable for decision without oral argument.  E.D. Cal. L.R. 230(g).  The hearing was scheduled for January 25, 2022.

1    Employment Agreement dated April 10, 2009 (the "2009 Employment

2    Agreement") and signed by Petree on May 4, 2009, and by an AJG

3    representative on May 27, 2009.  Ex. D. to Caldwell Decl.  The

4    2009 Employment Agreement provides: "[t]his Agreement contains

5    the entire agreement of the parties with respect to the subject

6    matters covered hereby.  The parties agree that all prior

7    negotiations or communications are of no force or effect."

8    Section 11(D) of the 2009 Employment Agreement.  It is undisputed

9    the 2009 Employment Agreement was given to Petree by mistake,

10   however, the parties dispute whether "the fact that Employment

11   Agreement 2 was given to Petree by mistake… render[s] it invalid

12   or unenforceable."  Opp'n at 14 (contending it is enforceable);

13   see also Mot. at 16 (contending it is void and unenforceable).

14       The 2008 Purchase Agreement and the 2008 Employment

15   Agreement include, inter alia, non-compete provisions ("the 2008

16   Noncompete Provisions").  See Section 7(f) of the 2008 Purchase

17   Agreement; Section 8 of the 2008 Employment Agreement.  The 2009

18   Employment Agreement also contains covenants, albeit less

19   restrictive ones.  See Section 8 of the 2009 Employment

20   Agreement.

21

22                        II.   OPINION

23       A.   Evidentiary Objections

24       Defendants filed a Statement of Undisputed Facts, see

25   Defs.' SUF, ECF No. 100-2, to which Plaintiff responded, see

26   Pl.'s Resp. to Defs.' SUF., ECF No. 104-1.  Plaintiff then filed

27   its own Separate Statement of Undisputed Facts, see Pl.'s SUF,

28   ECF No. 104-2, to which Defendants responded, see Defs.' Resp.

to Pl.'s SUF., ECF No. 106-4.  Further, Defendants raised evidentiary objections to Plaintiff's evidence.  <u>See</u> Defs.' Objs., ECF No. 106-3.

The Court has reviewed these evidentiary objections but declines to specifically rule on them as courts self-police evidentiary issues on motions for summary judgment and a formal ruling is unnecessary to the determination of these motions. <u>See</u> <u>Sandoval v. Cty. Of San Diego</u>, 985 F.3d 657, 665 (9th Cir. 2021)(citing to <u>Burch v. Regents of the Univ. of Cal.</u>, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006)).

B.    <u>Legal Standard</u>

Courts must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying [the documents] which it believes demonstrate the absence of a genuine issue of a material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Once the movant makes this initial showing, the burden rests upon the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  <u>Id.</u>  An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

///

4

C.   Analysis

   1.   Cal. Bus. & Prof. Code Sections 16600 and 16601

Defendants' leading argument for summary judgment on the second, fifth, sixth, and seventh causes of actions is that the 2008 Noncompete Provisions are void and unenforceable under California Business and Professions Code Section 16600.  Mot. at 9-13.  That Section provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Cal. Bus. & Prof. Code § 16600.  The 2008 Noncompete Provisions, according to Defendants, are precisely such unlawful restraints.  Mot. at 11.  AJG responds that these provisions are enforceable because they were entered into in connection with the sale of Petree's ownership interest in RPIS to AJG and, therefore, fall within a statutory exception to Section 16600's prohibition of restrictive covenants: Section 16601.  Opp'n at 5.  The Section 16601 exception covers restrictive covenants entered into in connection with the sale of a business entity or the goodwill of a business and specifically provides: "Any person who sells the goodwill of a business… may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold… has been carried on, so long as the buyer… carries on a like business therein."  Cal. Bus. & Prof. Code § 16601.

Defendants argue the Section 16601 exception does not apply for two reasons.  Mot. at 11-13.  First, the 2008 Noncompete Provisions are tied to Petree's employment, not to the sale of RPIS.  Id. at 12-13.  To support this contention, Defendants rely

5

on *Fillpoint, LLC v. Maas,* 208 Cal.App.4th 1170 (2012).  Id.
That case also involved two agreements - a stock purchase
agreement and an employment agreement - with noncompete
provisions which the plaintiff-business sought to enforce against
defendant-former-employee.  *Fillpoint*, 208 Cal.App.4th at 1173.
The court upheld the noncompete covenant in the purchase
agreement because "the purchase agreement's covenant was focused
on protecting the acquired goodwill for a limited period of
time."  Id. at 1180.  But the court struck down the noncompete in
the employment agreement, finding it did not fit

   within the 16601 exception and instead "targeted an
employee's fundamental right to pursue his or her profession."
Id. at 1183.  So too here argue Defendants.  Mot. at 12-13.
Because the restrictive covenants are tied to Petree's
employment, and not to the sale of RPIS, they target Petree's
fundamental right to pursue his profession, thereby violate
Section 16600, and do not fall under the Section 16601 exception.
Id.

   AJG counters the 2008 Noncompete Provisions protect the
goodwill acquired by AJG when it bought RPIS by prohibiting
Petree from soliciting RPIS customers for two years after his AJG
employment.  Opp'n at 5-6.  AJG points out the parties
specifically agreed the express purpose of those restrictive
covenants was to "protect the Personal Goodwill Assets, business
and other Property" that AJG was purchasing from Petree, and that
they were "reasonably necessary and tailored to protect
[Gallagher's] legitimate business interests."  Id. (citing to
Section 7(f) of the 2008 Purchase Agreement and Section 8 of the

1  2008 Employment Agreement).  The 2008 Agreements were also
2  entered into contemporaneously and in connection with the sale of
3  the RPIS's assets to AJG.  Id. at 7.  Petree signed both after
4  reviewing with counsel.  Id. at 6.

5      Further, AJG distinguishes Fillpoint as follows: whereas
6  here the noncompete provisions in the 2008 Purchase Agreement and
7  the 2008 Employment Agreement are identical, the noncompete
8  provisions in the stock purchase agreement and employment
9  agreement in Fillpoint were distinct.  Opp'n at 8-9.
10  Specifically, the stock purchase agreement contained a three-year
11  noncompete whereas the employment agreement contained a broad
12  one-year noncompetition agreement that became effective upon the
13  termination of the defendant's employment.  Fillpoint, 208
14  Cal.App.4th at 1174.  The distinction mattered because the latter
15  targeted the defendant's right to pursue his profession, whereas
16  the purchase agreement was focused on the acquired goodwill.  Id.
17  at 1182-1183.  Additionally, AJG points out the noncompete in the
18  employment agreement struck down in Fillpoint was significantly
19  broader than here.  Opp'n at 9.

20      In their reply, Defendants contend Plaintiff's attempt to
21  distinguish Fillpoint fails.  Reply at 4-5.  However, it is
22  Defendants' attempt to explain away the distinctions AJG
23  identified that falls short.  Defendants do not establish
24  Fillpoint is so factually similar that the Court should find it
25  controls here and warrants the grant of summary judgment.

26      For these reasons, Defendants' first argument as to why the
27  Section 16601 exception does not apply fails.  Their second
28  argument is the restricted activities in the 2008 Noncompete

7

1  Provisions are too broad to fall within Section 16601.  Mot. at

2  13.  To support their argument, Defendants cite to <u>Strategix,</u>

3  <u>Ltd. v. Infocrossing West, Inc.,</u> 142 Cal.App.4th 1068 (2006).

4  <u>Id.</u>  In that case, the court explained Section 16601 "limits the

5  geographic scope of a noncompetition covenant to the area where

6  the sold company carried on business" and "by extension… courts

7  may enforce nonsolicitation covenants barring the seller from

8  soliciting the <u>sold business's</u> employees and customers."

9  <u>Strategix</u>, 142 Cal.App.4th at 1073 (emphasis in original).  This

10  rule from <u>Strategix</u>, AJG counters, supports enforcement of the

11  2008 Noncompete Provisions.  Opp'n at 6-7.  Defendants had the

12  opportunity in their reply brief to address Defendants' <u>Strategix</u>

13  arguments yet failed to do so.  <u>See</u> Reply.  As such, Defendants

14  have not shown they are entitled to summary judgment under

15  <u>Strategix</u> due to the broadness of the 2008 Noncompete Provisions.

16      In sum, Defendants fail to demonstrate that as a matter of

17  law the Section 16601 exception does not apply to the 2008

18  Noncompete Provisions.

19           2.   <u>Severability</u>

20      Defendants further argue that if the Court finds the 2008

21  Noncompete Provisions to be unenforceable, the Court cannot sever

22  these provisions.  Mot. at 15.  However, as explained in the

23  previous section, Defendants did not establish these provisions

24  are unenforceable as a matter of law.  Thus, the Court does not

25  reach the parties' severability arguments.  <u>See</u> Mot. at 15; Opp'n

26  at 11-12.

27           3.   <u>Issue Preclusion</u>

28      Defendants next contend the 2008 Noncompete Provisions are

1   unenforceable under the doctrine of issue preclusion.  Mot. at

2   13-15.  Issue preclusion "bars 'successive litigation of an issue

3   of fact or law actually litigated and resolved in a valid court

4   determination essential to the prior judgment,' even if the issue

5   recurs in the context of a different claim.'"  Taylor v.

6   Sturgell, 553 U.S. 880, 892 (2008).

7        Here, Defendants argue the Northern District of California's

8   decision in Arthur J. Gallagher & Co. v. Tarantino, et al., 498

9   F.Supp.3d 1155(N.D. Cal. Nov. 2, 2020), bars AJG from enforcing

10  the 2008 restrictive covenants because there AJG's claims against

11  a different former employee based on "practically word-for-word

12  identical" non-compete provisions were dismissed.  Mot. at 14.

13  But a close reading of Tarantino indicates issue preclusion does

14  not apply here because the issues were not identical nor actually

15  litigated.  See Opp'n at 9-11, 13.  For instance, the Tarantino

16  court did not determine any issues involving restrictive

17  covenants found in a purchase agreement because there was no

18  purchase agreement at issue in that case.  See 498 F.Supp.3d

19  1155.  Because multiple issues present in this case were not

20  actually litigated in Tarantino, issue preclusion does not apply.

21             4.   2009 Employment Agreement

22        Defendants present two additional arguments as to the second

23  and seventh causes of action.  Mot. at 15, 16.  Beginning with

24  the second cause of action for breach of the implied-in-fact

25  contract, Defendants argue: "By AJG's own allegations, its second

26  cause of action for breach of implied-in-fact contract is an

27  attempt to subject Petree to the 2008 restrictive covenants, if

28  the 2008 agreement was superseded by the 2009 Employment

1   Agreement.  However, because the 2008 restrictive covenants are

2   not enforceable… Plaintiff's second cause of action must fail."

3   Mot. at 15.  But for the reasons explained above, Defendants have

4   not established the 2008 provisions are unenforceable as a matter

5   of law.  Therefore, this argument as to the second cause of

6   action necessarily fails.

7       As to the seventh cause of action, Defendants contend that

8   because AJG never intended to enter into the 2009 Employment

9   Agreement, that Agreement is void and unenforceable.  Mot. at 16.

10  Specifically, Defendants argue for rescission of the 2009

11  Employment Agreement based on unilateral mistake.  Id.

12      A party may rescind a contract if "consent of the party

13  rescinding… was given by mistake."  Cal. Civ. Code § 1689(b)(1).

14  California Civil Code Section 1577 defines mistake of fact as "a

15  mistake, not caused by the neglect of a legal duty on the part of

16  the person making the mistake, and consisting in: (1) An

17  unconscious ignorance or forgetfulness of a fact past or present,

18  material to the contract; or (2) Belief in the present existence

19  of a thing material to the contract, which does not exist, or in

20  the past existence of such a thing, which has not existed."  Cal.

21  Civ. Code § 1577.  Here, it was AJG which made a mistake giving

22  Petree the 2009 Employment Agreement, as AJG's person most

23  qualified ("PMK") witness, Bruce Caldwell, testified in his

24  deposition.[2]  Mot. at 16 (citing to Caldwell Depo., Ex. A. to

25  _____

    [2] The Court briefly acknowledges AJG's objection to Defendants'
26  use of its PMK's deposition testimony on the grounds "Defendants'
    questioning was improper because it called for a lay witness to
27  provide a legal conclusion."  Opp'n at 17.  However, the Court
    reiterates that it self-polices evidentiary issues on motions for
28  summary judgment and specifically ruling on evidentiary

1    O'Brien Decl., ECF No. 100-3).  Due to this mistake of fact,

2    Defendants contend the 2009 Employment Agreement should be

3    rescinded, and the seventh cause of action based upon that

4    Agreement fails.  Id.

5         AJG insists, however, the 2009 Employment Agreement is

6    enforceable.  Opp'n at 14-18.  As an initial matter, AJG concedes

7    Petree was given this agreement by mistake because it "was

8    intended to be given to producers and account executives who were

9    not merger partners."  Id. at 14.  Petree, as a merger partner

10   whose business had been acquired by AJG, should have an

11   employment agreement tied to the purchase agreement.  Id.

12   Nevertheless, AJG contends this mistake does not render the 2009

13   Employment Agreement invalid or unenforceable because (1) the

14   evidence establishes the mutual assent of the parties, (2) Petree

15   did not plead mistake of fact as an affirmative defense, and (3)

16   even if Petree had pled this defense, he cannot establish any of

17   the elements.  Id.

18        As to mutual assent, AJG argues "ordinarily, one who accepts

19   or signs an instrument, which on its face is a contract, is

20   deemed to assent to all its terms."  Opp'n at 14 (quoting Meyer

21   v. Benko, 55 Cal.App.3d 937, 943 (1976)).  Indeed, "the general

22   rule is that when a person with the capacity of reading and

23   understanding an instrument signs it, he is, in the absence of

24   fraud and imposition, bound by its contents, and is estopped from

25   saying that its explicit provisions are contrary to his

26   intentions or understanding."  Meyer, 55 Cal.App.3d at 943.

27

28   objections is unnecessary.  See Sandoval, 985 F.3d at 665.

1    Here, Petree accepted and signed the 2009 Employment Agreement.

2    See 2009 Employment Agreement at 18.  He does not contend

3    otherwise in his reply.  See Reply.  Nor does Petree respond to

4    AJG's second argument that Defendants failed to plead the

5    affirmative defense of mistake of fact and thereby waived this

6    defense, see Opp'n at 14-15; nor to AJG's final argument that the

7    unilateral mistake of fact defense is generally raised by the

8    mistaken party against whom contract enforcement is being sought

9    and here the mistaken party was AJG not Petree, see id. at 15.

10   Failure to oppose these arguments constitutes waiver and does not

11   demonstrate an entitlement to summary judgment.  Richardson-Bass

12   v. State Center Cmty. College District, Case No. 1-19-cv-01566-

13   AWI-SAB, 2020 WL 5658225, at *15 (E.D. Cal. Sept. 23, 2020).

14       Defendants instead pivot in their reply brief and argue that

15   if the Court finds the 2009 Employment Agreement is valid, then

16   the Court should find its restrictive covenants supersede those

17   in both 2008 Agreements.  Reply at 8-9.[3]  AJG contends the

18   opposite.  See Opp'n at 17-18.  Specifically, AJG emphasizes that

19   when Petree sold his business to AJG and agreed to the applicable

20   restrictive covenants, he agreed that if the 2008 Employment

21   Agreement were to be modified in the future, any such

22   modification would need to be in a writing that specifically

23   referred to that Agreement.  Id. at 18.  Section 11(D) of the

24

25   [3] Defendants also raise a new argument that AJG cannot show
     Petree violated the 2009 restrictive covenants.  Reply at 9-10.
26   However, it is improper for Defendants to raise new issues in
     reply.  See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d
27   912, 919 (9th Cir. 2001)("[I]ssues which are not specifically and
     distinctly argued and raised in a party's opening brief are
28   waived.")  Thus, the Court did not consider this argument.

2008 Employment Agreement provides: "this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument shall acknowledge that it is an amendment or modification of this Agreement."  The parties dispute whether the 2009 Employment Agreement so acknowledged. AJG contends that although the 2009 Employment Agreement provided generally that it was intended to be an amendment to any existing employment agreement, it did not specifically acknowledge that it was an amendment or modification to the 2008 Employment Agreement.  Opp'n at 18.  Accordingly, it did not supersede the 2008 Employment Agreement and the restrictive covenants therein. Id.  Nor did the 2009 Employment Agreement supersede the 2008 Purchase Agreement because the subject matters of the two Agreements were distinct.   Id.

Defendants counter that the 2009 Employment Agreement did not need to specifically name the 2008 Employment Agreement in order for the 2009 restrictive covenants to supersede the 2008 restrictive covenants.  Reply at 8-9.  According to Defendants, it suffices that the 2009 Employment Agreement states: "This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby.  The parties agree that all prior negotiations are of no force or effect.  Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement."  Section 11(D) of the 2009 Employment Agreement.

The Court does not agree that this is consistent with the plain language of the 2008 Employment Agreement, which requires

13

1   any modification to "acknowledge" that it is "an amendment or

2   modification of <u>this Agreement</u>."  Section 11(D) of the 2008

3   Employment Agreement (emphasis added).  The key phrase is "<u>this</u>

4   <u>Agreement</u>."  While Section 11(D) of the 2009 Employment Agreement

5   generally acknowledges "all prior negotiations," it does not

6   specifically acknowledge the 2008 Employment Agreement as the

7   plain language of Section 11(D) of the 2008 Employment Agreement

8   requires.  Accordingly, Defendants fail to establish the 2009

9   restrictive covenants supersede the 2008 covenants as a matter of

10  law, and thus are not entitled to summary judgment on the seventh

11  cause of action.

12              5.   <u>Trade Secret Misappropriation Claims</u>

13       Defendants argue that even if the Court finds the

14  restrictive covenants are enforceable, they are still entitled to

15  summary judgment on the second, third, fourth, fifth, sixth, and

16  seventh causes of action because AJG cannot show (1) Petree

17  breached the agreements by soliciting AJG clients and employees

18  or (2) that Defendants misappropriated trade secrets or

19  confidential information.  Mot. at 16-24.  AJG counters that

20  genuine issues of material fact exist as to these trade secret

21  misappropriation claims and thereby preclude summary judgment.

22  Opp'n at 18-24.

23       The CUTSA defines a "trade secret" as "information,

24  including a… compilation… that (1) Derives independent economic

25  value, actual or potential, from not being generally known to the

26  public or to other persons who can obtain economic value from its

27  disclosure or use; and (2) is the subject of efforts that are

28  reasonable under the circumstances to maintain its secrecy."

Cal. Civ. Code § 3426.1(d).  Similarly, the DTSA defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically… or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

Beginning with the list of client e-mail addresses Petree provided to HUB, Defendants contend this list does not constitute a trade secret.  Mot. at 16.  Specifically, Defendants argue a list of clients and their contact information, without more, is not a trade secret because it is generally and publicly available information and thus is not confidential.  Id. at 18 (citing to Morlife, Inc. v. Perry, 56 Cal.App.4th 1514 (1997)).  In Morlife, Inc., the court of appeals affirmed the trial court's finding that "a compilation, developed over a period of years, of names, addresses, and contact persons, containing pricing information and knowledge about particular roofs and roofing needs of customers using its services" constituted a trade secret.  56 Cal.App.4th at 1521.  The court reasoned the client list "had independent economic value" as "the identity of those particular

commercial buildings using such services is not generally known."
Id.; see also American Credit Indemnity, Co. v. Sacks, 213
Cal.App.3d 622, 631 (1989).  By contrast, client lists are not
protected trade secrets where "the names and addresses of
persons, firms and corporations using the type of products sold
by plaintiff are commonly known to the trade."  Sacks, 213
Cal.App.3d at 633-634; see also Morlife, 56 Cal.App.4th at 1521-
1522 ("With respect to the general availability of customer
information, courts are reluctant to protect customer lists to
the extent they embody information which is 'readily
ascertainable' through public sources, such as business
directories… the more difficult information is to obtain, and the
more time and resources expended by an employer in gathering it,
the more likely a court will find such information constitutes a
trade secret.").  Defendants contend the client e-mail list here
falls into the latter category as "what Petree shared was not
anything private which derived economic value."  Mot. at 20.  All
of the client names and e-mail addresses, Defendants point out,
are publicly available, for example on clients' websites or their
LinkedIn profiles.  Id.  AJG did not spend significant time or
resources to compile the list.  Id.  It is "simply a list of
email addresses, akin to information in a public phone book."
Id.

In opposition, AJG responds first by pointing out it is
undisputed that (1) Petree provided HUB with a list of clients,
the representatives of those clients with whom he dealt, and
their contact information; and (2) HUB used this information to
send a targeted communication to those clients.  Opp'n at 18.

16

1  According to AJG, this alone creates a triable issue of fact on

2  the trade secret misappropriation claim.  Id.  Other triable

3  issues of fact include: whether AJG's IT employee in fact

4  uploaded the client information to Petree's personal Gmail

5  account, whether Petree waited for clients to contact him or

6  whether he initiated that contact, and whether Petree shared

7  trade secret information with HUB before he resigned from AJG.

8  Id. at 19.  As to the client e-mail list, AJG emphasizes that

9  "[w]hether information is a trade secret is ordinarily a question

10  of fact."  Id. (citing to San Jose Construction, Inc. v.

11  S.B.C.C., Inc., 155 Cal.App.4th 1528, 1537 (2007)).  Here, AJG

12  has brought forward enough evidence to create a triable issue as

13  to whether the client information Petree shared is more than just

14  publicly available names and e-mails and instead shared the type

15  of insurance products the clients needed, which is not publicly

16  available, and may constitute a legally protectable trade secret.

17  See Opp'n at 20-21.

18      Next, Defendants contend that even if the client e-mail list

19  Petree shared with HUB did constitute a trade secret, AJG is not

20  entitled to trade secret protection because it did not take

21  reasonable steps to maintain the secrecy of the list.  Mot. at

22  20-21 (citing to Morlife, 56 Cal.App.4th at 1521-1523).  Under

23  both the CUTSA and DTSA, for information to qualify as a trade

24  secret, reasonable steps must be taken to protect the secrecy of

25  the information.  See Cal. Civ. Code § 3426.1(d)(2); 18 U.S.C. §

26  1839(3)(A).  Here once again, AJG has brought forward enough

27  evidence to create a triable issue as to whether it took

28  reasonable steps to maintain the secrecy of the client list.  See

Opp'n at 21-22.  Defendants stress that an AJG IT employee worked with Petree to upload his client contacts to a private e-mail account used for Petree's side business, a wine group called Petree Cellars, which was accessible by third parties, including Petree's wife.  Mot. at 21.  This, according to Defendants, reflects AJG's failure to take reasonable efforts to maintain the secrecy of the information.  <u>Id.</u>  AJG, however, counters with evidence that: Petree entered into multiple agreements to protect AJG's confidential information and trade secrets; he completed training on AJG's corporate confidentiality and data use policies, and he signed AJG's Mobile Device Policy governing his use of personal devices to connect with AJG's email and other information.  Opp'n at 22.  Additionally, AJG points out it uses password protected computer systems, and software to secure and manage its applications and information on its employees' mobile devices.  <u>Id.</u>  This is sufficient to create a triable issue as to whether AJG took reasonable steps to maintain the secrecy of its client list.

Third, Defendants contend that even if the client e-mail list did constitute a trade secret and even if AJG took reasonable steps to protect that list, there was no misappropriation because the use of a client list for an announcement of a change of employment is permitted.  Mot. at 22-23.  To support this argument, Defendants cite to the <u>Sacks</u> court's holding that: "the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition."  213 Cal.App.3d at 636.  In <u>Sacks</u>, the defendant-former employee sent

1   a letter to clients of her former employer that went beyond

2   merely announcing a change of employment instead amounting to a

3   solicitation.  Id.  The letter informed customers of "interesting

4   competitive alternatives" at the new company, inviting them to

5   inquire about the new company's policy, and indicating she would

6   happy to "discuss it in detail when they are ready to renew."

7   Id.  The court found this announcement did more than simply

8   announce a "new affiliation," but rather solicited clients to

9   move to their business.  Id. at 636-637.  By contrast here,

10  Defendants contend HUB's e-mail announcing it had hired Petree

11  did not go beyond a mere announcement and thus was permitted

12  under Sacks.  Mot. at 22.  Defendants add that AJG has no

13  evidence Petree solicited clients; rather, he "simply waited for

14  his former clients to contact him" following HUB's announcement

15  and his update to his LinkedIn profile.  Id. at 23.  Likewise,

16  Defendants contend Petree did not solicit AJG employees.  Id. at

17  24.  In opposition, AJG contends there is sufficient evidence to

18  create a triable issue as to misappropriation.  Opp'n at 22-24.

19  The Court agrees.

20      Misappropriation of trade secrets can be established by

21  circumstantial evidence.  UniRAM Tech., Inc. v. Taiwan

22  Semiconductor Mfg. Co., 617 F.Supp.2d 938, 944 (N.D. Cal. 2007)

23  ("Circumstantial evidence is particularly appropriate in trade

24  secret cases.").  Here there is enough circumstantial evidence

25  from which a reasonable jury could conclude that Defendants

26  misappropriated Plaintiff's trade secrets.  See Opp'n at 23-24

27  (summarizing evidence of misappropriation).  For instance, AJG

28  brought forward evidence that "HUB wanted Petree to bring

Gallagher's clients to HUB, that HUB knew of the restrictive
covenants, that Petree lacks credibility regarding his claim that
he waited until after he left Gallagher to provide Gallagher's
clients' contact information to HUB, and that he just sat back
and waited for the phone to ring without doing anything to
proactively solicit Gallagher's clients using Gallagher's trade
secret information." Opp'n at 24. Given these disputes of
material fact, summary judgment on the issue of misappropriation
is unwarranted.

Defendants' arguments in reply do not alter this analysis.
Reply at 1-4. Specifically, Defendants contend that AJG's
submission of five e-mails and two meeting invitations from
Petree to six clients out of the nearly two dozen clients that
AJG alleges Defendant illegally contacted is insufficient to
raise a triable issue of fact. Id. at 1. First, Defendants
argue this evidence is inadmissible for failure to identify it in
discovery. Id. at 1-2. Second, they argue the substance of the
e-mails and the meeting invitations do not create a triable issue
because none indicate Petree did not wait for his former clients
to contact him after he joined HUB. Id. at 2-3. Rather these
communications "imply some previous conversation." Id. at 3.
Defendants also highlight AJG's failure to submit any
declarations from any client stating Petree contacted them first.
Id. From Petree's declaration and the declarations of nine
former AJG client's corroborating Petree's declaration,
Defendants argue the Court should conclude there is no triable
issue. Id.

The Court does not so conclude. AJG's evidence in

opposition, <u>see</u> Opp'n at 23-24, is sufficient to create a triable issue as to misappropriation.

Lastly, Defendants add that there is no evidence they acquired the client e-mail list by improper means.  Mot. at 23-24.  Both DTSA and CUTSA require the acquisition of trade secret information to be through "improper means" in order to be actionable; and both define "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); Cal. Civ. Code. § 3426.1(a).  Defendants state Petree acquired the client e-mail list in the course of his employment, and HUB acquired it from Petree in order to send an employment announcement, and contend neither constitute improper means.  Mot. at 23-24.  To support their position, they cite to two non-binding, out-of-circuit decisions: <u>Packaging Corp. of America, Inc. v. Croner</u>, 419 F.Supp.3d 1059 (N.D. Ill. 2020) and <u>Prominence Advisors, Inc. v. Dalton</u>, No. 17 C 4369, 2017 WL 6988661 (N.D. Ill. Dec. 18, 2017).  These decisions do not persuade the Court summary judgment is warranted, particularly in light of the evidence of improper means AJG brought forward in opposition.  <u>See</u> Opp'n at 23-24 (summarizing evidence).

> 6.   <u>Earnout Payments</u>

In three short paragraphs tacked on to the end of their motion and one short paragraph at the end of their reply, Defendants argue they are entitled to summary judgment on the first cause of action pertaining to the Earnout Payments.  Mot. at 24-25; Reply at 10.  Specifically, Defendants insist the

1   Earnout Payments were a negotiated term of the 2008 Purchase

2   Agreement and were related to Petree's ability to generate

3   revenue in the first three years of his employment, not to the

4   restrictive covenants.  Id. at 25.  In other words, the

5   enforceability of the restrictive covenants has no bearing on the

6   Earnout Payments.  Id.

7       AJG responds to Defendants' arguments regarding the Earnout

8   Payments in an equally cursory manner.  Opp'n at 24-25.  Because

9   the parties have not done this issue "justice by making what is

10  effectively a passing reference to it in their briefs… the Court

11  declines to take it up in that underdeveloped form." Shen v.

12  Albany Unified Sch. Dist., 3:17-cv-02478-JD, 2018 WL 4053482, at

13  *4 (N.D. Cal. Aug. 24, 2018).  Therefore, the Court also denies

14  Defendants' motion as to the first cause of action.

15

16                  III.   ORDER

17      For the reasons set forth above, Defendants' Motion for

18  Summary Judgment is DENIED.

19      IT IS SO ORDERED.

20  Dated: April 26, 2022

21                                    _____

22                                    JOHN A. MENDEZ,
                                      UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

                                    22